IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| SHARIA KENNEDY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:23-cv-01362 |
| | ) | |
| CEVA LOGISTICS U.S., ING. and WOOD | ) | JUDGE CAMPBELL |
| PERSONNEL SERVICES, INC., | ) | MAGISTRATE JUDGE FRENSLEY |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Pending before the Court are Defendant Ceva Logistics U.S., Inc.'s ("CEVA") and Defendant Wood Personnel Services, Inc.'s ("WPS") respective motions for summary judgment (Doc. Nos. 22, 25), which are fully briefed. (*See* Doc. Nos. 34, 36, 37, 39). For the reasons stated herein, Defendants' motions will be **DENIED**.[1]

### I.    FACTUAL BACKGROUND

Plaintiff Sharia Kennedy ("Ms. Kennedy") brings this civil rights action against her former employers Defendants CEVA and WPS.[2] CEVA is a logistics company that provides supply chain

---

[1] For ease of reference, the statements of material facts and responses there are cited as follows:

- CEVA's Statement of Undisputed Material Facts (Doc. No. 24) together with Ms. Kennedy's Response (Doc. No. 34-2) is cited as "CEVA SOF ¶ __."

- WPS's Statement of Undisputed Material Facts (Doc. No. 27) together with Ms. Kennedy's Response (Doc. No. 36-2) is cited as "WPS SOF ¶__."

- Ms. Kennedy's Statement of Additional Material Facts (Doc. Nos. 34-2, 36-2) together with CEVA and WSP's Responses (Doc. Nos. 38, 40) is cited as "Pl. SOF ¶__."

[2] At this stage, the Court construes the factual record in the light most favorable to Ms. Kennedy, the nonmoving party. *C.S. v. McCrumb*, 135 F.4th 1056, 1060 (6th Cir. 2025). The factual background in this Memorandum it is not a complete statement of the facts in this case but rather includes the facts necessary for the Court's analysis and resolution of the moving parties' arguments.

management services. (CEVA Answer, Doc. No. 12 ¶ 3). WPS is a staffing and recruiting company that employs individuals who are assigned to work on temporary assignments at various client locations. (WPS SOF ¶ 1). From June 27, 2022 until December 1, 2022, Ms. Kennedy worked for WPS on a temporary assignment to CEVA in an hourly warehouse position performing typing and other administrative work. (Pl. SOF ¶¶ 2-3; CEVA SOF ¶¶ 1-2; WPS SOF ¶ 2). Ms. Kennedy is a Black female who was 39 years old at all relevant times. (Pl. SOF ¶ 1).[3]

WPS had an employee located onsite at the CEVA facility, Hailey Fryer ("Ms. Fryer"), who was Ms. Kennedy's direct supervisor at WPS and communicated with Ms. Kennedy about her job at CEVA. (Pl. SOF ¶¶ 5-6). CEVA supervised Ms. Kennedy's work through its onsite management and supervisory employees such that she directly reported to a management supervisor, Cyril Brown ("Mr. Brown") and was also supervised by a shift leader, Chris Reyes ("Mr. Reyes"). (WPS SOF ¶ 4; Pl. SOF ¶¶ 8-10).[4] Mr. Reyes also directly reported to Mr. Brown. (Pl. SOF ¶ 10). Ms. Kennedy worked at a desk/table in a warehouse with many other employees in the area, including her daughter. (*Id*. ¶¶ 11, 13). Mr. Brown was often near Ms. Kennedy and in her presence throughout the day, as was Mr. Reyes. (*Id*. ¶¶ 11-12). As such, Mr. Brown was often in the presence of both Ms. Kennedy and Mr. Reyes. (*Id*. ¶ 12).

From mid-July until his termination on October 31, 2022, Mr. Reyes routinely subjected Ms. Kennedy to unwelcome harassment based on her sex and race. (Pl. SOF ¶¶ 15, 21, 40-43; CEVA SOF ¶ 38). The first incident Ms. Kennedy remembers is when she was being trained by

---

[3] Ms. Kennedy obtained her job at CEVA by applying for employment through WPS. (Pl. SOF ¶ 4). WPS provided Ms. Kennedy with orientation training and CEVA's employment policies and handled the payroll transactions whereby she was paid the wages she earned at her job at CEVA. (*Id*.). CEVA determined Ms. Kennedy's job duties, pay rate, and whether she was promoted, disciplined, or terminated. (*Id*. ¶ 7).

[4] There is a material dispute of fact regarding whether Mr. Reyes was a co-worker or supervisor for purposes of employer liability under Title VII. (*See* CEVA SOF ¶ 20).

another female employee in mid-July of 2022, when Mr. Reyes started talking about her butt, and how he wanted to "bend her over." (Pl. SOF ¶¶ 19-20). By the end of July, Mr. Reyes was making similar types of inappropriate comments to Ms. Kennedy and other female employees every day, multiple times a day, often in the presence of Mr. Brown. (*Id*. ¶¶ 21, 45). Mr. Reyes repeatedly told Ms. Kennedy how "sexy" and "cute" she was, and how she needed to get a man. (*Id*. ¶ 23). He would tell Ms. Kennedy that he could be her man and would say how much money he had for her. (*Id*. ¶ 24). Mr. Reyes would often point down to his pants and say, "can you see my print," referring to the impression of his penis on his pants. (*Id*. ¶ 25). Mr. Reyes would also show Ms. Kennedy pictures of himself nude and pictures and videos of himself and another woman engaged in sex acts. (*Id*. ¶ 27). Ms. Kennedy personally observed Mr. Reyes showing these videos to many other employees as well and making sexual comments to other women. (*Id*. ¶¶ 18, 28).

Additionally, Mr. Reyes engaged in repeated physical touching of Ms. Kennedy by putting his hands on her hips, legs, arms and shoulders. (*Id*. ¶¶ 16, 29-30). He would come up behind Ms. Kennedy while she was sitting at her desk in the warehouse and cuddle his arms around her with his hands on the desk, massage her shoulders, and put his arms around her waist. (*Id*.).

On August 2, 2022, Mr. Reyes grabbed Ms. Kennedy's breast. (*Id*. ¶ 31). It was the beginning of the workday and Ms. Kennedy was wearing a shirt with an African descent tag sewn into it, when Mr. Reyes said, "look at this shirt," and reached out his hand as if he were reaching for the tag but then grabbed Ms. Kennedy's breast and started laughing. (*Id*. ¶¶ 17, 31-32, 34-37). Although Mr. Brown was standing with Mr. Reyes and Ms. Kennedy when the foregoing occurred and made eye contact with Ms. Kennedy during the incident, Mr. Brown said nothing at the time. (*Id*. ¶¶ 33, 38-39, 46). On another occasion, on August 31, 2022, Mr. Reyes asked Ms. Kennedy whether she performed oral sex on a Black man, referring to the Black man by the "N" word. (*Id*.

3

¶¶ 15, 26, 115). Mr. Reyes also repeatedly told Ms. Kennedy that he would "buy" her daughter – as if she were a slave to be bought. (*Id*. ¶¶ 22, 116).

During July and August of 2022, Mr. Brown was present and personally observed many instances of Mr. Reyes' harassing conduct towards Ms. Kennedy and the other women who worked in the warehouse, but he took no corrective action to stop the harassment. (*Id*. ¶¶ 44-47).

On September 1, 2022, after Mr. Brown did not address or make any effort to stop Mr. Reyes' harassing conduct, Ms. Kennedy reported Mr. Reyes' sexual and racial harassment to Ms. Fryer, WPS's onsite representative at CEVA to get the harassment stopped so that she and her daughter could have a safe work environment. (*Id*. ¶¶ 48, 52).[5] Ms. Fryer informed Ms. Kennedy that Mr. Reyes had been reported to her office before on several different occasions, and that he was "a problem." (Pl. SOF ¶ 49).[6]

WPS notified CEVA of Ms. Kennedy's complaint the same day, September 1, 2022. (Doc. No. 22-2 ¶ 8). CEVA's HR director, Lee Latimer, investigated her complaint of sexual harassment by speaking with witnesses. (Anderson Declaration, Doc. No. 22-2 ¶¶ 11-12; Pl. SOF ¶ 121). On September 7 and 8, 2022, Ms. Kennedy had interviews with CEVA and WPS's respective HR directors, Lee Latimer and Mitch Glenn. (Pl. SOF ¶ 55; WPS SOF ¶¶ 15-16). Ms. Kennedy also had further discussions with CEVA's human resource manager, Mary Anderson, and WPS's onsite representative at CEVA, Ms. Fryer. (Pl. SOF ¶ 56). During her discussions with the foregoing individuals, Ms. Kennedy explained Mr. Reyes's sexual and racial harassment and provided them with names of other employees who were witnesses to and victims of sexual harassment. (*Id*. ¶57).

---

[5] WPS disputes Ms. Kennedy reported Mr. Reyes' racial harassment. (Pl. SOF ¶ 48; WPS SOF ¶ 7).

[6] WPS disputes these facts and points to the declaration of its onsite representative at CEVA, stating that September 1, 2022, "was the first time that anyone had ever raised any concerns regarding Reyes" to her. (*See* Pl. SOF ¶ 49; WPS SOF ¶ 8).

4

As part of his investigation, Mr. Latimer, CEVA's HR director, came out onto the warehouse floor and had Ms. Kennedy describe and reenact her reported sexual harassment in plain view of other employees. (Pl. SOF ¶ 64-66).[7] Ms. Kennedy felt humiliated by the foregoing experience and believes it was retaliation for her reports of sex and race harassment and that it was also discrimination based on her sex and race. (*Id*. ¶ 66-70).

Although Ms. Kennedy expected CEVA and WPS to remove Mr. Reyes from being shift leader and get him away from her and other women he was harassing, that did not occur. (*Id*. ¶ 53). Neither CEVA nor WPS offered to separate Ms. Kennedy from Mr. Reyes, and Mr. Reyes remained in his position as Ms. Kennedy's shift leader for September and October during which he continued to engage in the same harassing conduct with the same frequency and severity. (*Id*. ¶¶ 54, 57-58, 62, 92, 99). Mr. Brown continued to supervise Ms. Kennedy and Mr. Reyes and continued to witness Mr. Reyes' harassing conduct of Ms. Kennedy and others. (*Id*. ¶ 63).[8]

On September 22, 2022, Mr. Latimer advised WPS that he was planning on concluding his investigation within the following week, which WPS then communicated to Ms. Kennedy. (Glenn Declaration, Doc. No. 25-2 ¶¶ 6, 30; WPS SOF ¶ 19). The next day, on September 23, 2022, Mr. Latimer met with Mr. Reyes and questioned him about Ms. Kennedy's allegations, which Mr. Reyes denied. (CEVA SOF ¶ 17; Doc. No. 22-4). On September 27, 2022, Mr. Latimer issued Mr. Reyes a warning for violating CEVA's sexual harassment policy. (Doc. No. 22-5).

---

[7]  CEVA's sexual harassment policy at the time stated that: "Human Resources will keep the complaint and the information revealed in the investigation confidential" unless the disclosure of such confidential information is "deemed necessary to investigate and remedy violations." (Doc. No. 22-3 at PageID # 174).

[8]  CEVA's sexual harassment policy at the time stated that: "management and supervisory employees may face disciplinary action if they fail to take corrective action after becoming aware of the alleged or possible existence of harassment or discrimination." (Doc. No. 22-3 at PageID # 175).

5

A few days later, Mr. Latimer issued an Internal Complaint Resolution (Doc. No. 22-6) with his findings that Mr. Reyes had sexually harassed other female employees but not Ms. Kennedy. (Pl. SOF ¶¶ 71-73, 117). The Resolution document did not mention racial harassment or include any findings about racial harassment. (*Id*. ¶ 122). Mr. Latimer informed Ms. Kennedy of his findings from the investigation on or about September 29, 2022. (*Id*. ¶ 71). At that time, Mr. Latimer's proposed resolution was to offer Ms. Kennedy a full-time job with CEVA. (*Id*. ¶ 74). Ms. Kennedy disagreed with the resolution and did not sign the resolution paperwork because CEVA did not remove Mr. Reyes from being the shift lead, which would have protected her and other women from his harassment. (*Id*. ¶ 75).

Later that day, Ms. Kennedy was in the break room with her daughter during a stop in production, when the employees are allowed to go into the break room to eat or rest. (*Id*. ¶ 78-79). Ms. Kennedy was eating an apple, another employee had something in the microwave, and another employee was in the bathroom. (*Id*. ¶ 80). Mr. Brown walked in and came straight up to Ms. Kennedy and her daughter and started yelling at them and saying that Ms. Kennedy could not be in the break room eating an apple, and that break time was over. (*Id*. ¶ 81). When Ms. Kennedy came out of the break room, everyone was staring at her, including Mr. Reyes. (*Id*. ¶ 82). Mr. Brown then called a higher-level manager, Mitch, who yelled at Ms. Kennedy at the top of his lungs and sent her and her daughter home. (*Id*. ¶ 83).

Ms. Kennedy immediately informed Ms. Fryer about the foregoing incident, which she believes was retaliation in response to her reports of harassment and further discrimination. (*Id*. ¶¶ 85-86). The next day, Mr. Brown removed all of Ms. Kennedy's work items from her work area and told everyone that she had been fired. (*Id*. ¶ 87). Ms. Kennedy believes this was also retaliation as well as further discrimination. (*Id*. ¶¶ 88-89).

Throughout September and October 2022, Mr. Reyes continued to be the shift lead and continued to engage in sexually and racially harassing conduct. (*Id*. ¶¶ 76, 92). Ms. Kennedy reported Mr. Reyes' continued harassment to CEVA and WPS. (*Id*. ¶¶ 77, 98).[9] On October 11, 2022, Ms. Kennedy sent CEVA's HR a letter saying that she appealed the resolution decision communicated to her on September 29, 2022, because it only found that Mr. Reyes harassed other female employees, but not her. (Pl. SOF ¶ 90). Ms. Kennedy also explained the apple incident and how Mr. Brown cleaned out her office the next day. (*Id*. ¶ 91).[10] The following week, WPS garnished $172.75 from Ms. Kennedy's paycheck. (Doc. No. 25-9).

At the end of March 2023, Ms. Kennedy filed a charge with EEOC, which stated:

> I began working for the above-named employer on June 27, 2022, as a Specialist. The employer has more than 15 employees.
>
> During my employment, Christopher Reyes (Mexican, Male), subjected me to a sexually tainted work environment. On September 6, 2022, I reported the sexual harassment to management, but the harassment continued. After making my complaint, I was subjected to different terms and conditions of employment when I was sent home for eating an apple in the break room and when my wages were garnished. Also, during the investigation into my allegations, I was interrogated in front of my co-workers, so everyone knew I was the employee who made the complaint. On December 1, 2022, I quit because my wages were being garnished.
>
> I believe that I have been discriminated against based on my sex (Female), Race (African American), color (Brown) and retaliated against for my protected activity, in violation of Title VII of the Civil Rights Act of 1964[.]

(EEOC charge, Doc. No. 25-12).

---

[9] WPS disputes this fact in its briefing. (Doc. No. 26 at 17 ("Plaintiff never reported any additional concerns or complaints regarding further inappropriate conduct of sexual nature from Reyes to WPS after her initial *sic* September 6, 2022.") (citing WPS onsite representative at CEVA, Doc. No. 25-1 ¶ 42)).

[10] In her letter, Ms. Kennedy also complained that Mr. Latimer did not review surveillance camera footage of the warehouse that would have substantiated her allegations. (*See* Doc. No. 22-7).

On December 24, 2023, Ms. Kennedy filed the present action against CEVA and WPS, asserting claims against them under Title VII for sexually and racially hostile work environment (Counts I and II) and retaliation (Count III). (*See* Complaint, Doc. No. 1).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id*.

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id*. The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

### III. LAW AND ANALYSIS

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual ... because of such individual's race, color, religion, sex, or national origin" as well as from retaliating against employees for opposing unlawful discrimination. 42 U.S.C. §§ 2000e–2(a)(1), 3(a). As explained below, Defendants fail to show the absence of material disputes of fact or that judgment is appropriate as a matter of law as to any of Ms. Kennedy's claims against them. The Court will address Defendants' arguments for summary judgment in turn.

**A. Affirmative Defense – Failure to Exhaust Administrative Remedies**

"Individuals who bring Title VII discrimination claims in federal court must exhaust their administrative requirements first." *Moore v. Coca-Cola Bottling Co. Consol.*, 113 F.4th 608, 621-22 (6th Cir. 2024) (citing 42 U.S.C. § 2000e-5(e)). "A plaintiff exhausts her administrative remedies on those claims when she includes them in her EEOC charge." *Hayes v. Clariant Plastics & Coatings USA, Inc.*, -- F.4th --, No. 24-1336, 2025 WL 2017117, at *10 (6th Cir. July 18, 2025) (citing 42 U.S.C. § 2000e–5(f)(1); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)).[11] "Failure to exhaust in the context of Title VII claims is an affirmative defense that defendants bear the burden of pleading and proving." *Moore*, 113 F.4th at 622 (internal quotations omitted).

WPS contends that Ms. Kennedy failed to exhaust her administrative remedies for her racially hostile work environment claim because she did not include facts about racial harassment in the summary portion of her EEOC charge. However, Ms. Kennedy alleged in her EEOC charge

---

[11] The EEOC does "not hold complaining individuals to the requirements of artful legal pleading; they demand only that the charge provide information sufficient 'to identify the parties, and to describe generally the action or practices complained of.'" *Equal Emp. Opportunity Comm'n v. Ferrellgas, L.P.*, 97 F.4th 338, 349 (6th Cir. 2024) (quoting 29 C.F.R. § 1601.12(b)); *see, e.g., Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 782 (6th Cir. 2024) ("We underscore that [EEOC] charges are not lawsuits and neither Milczak nor any other complainant needs to demonstrate each element of the hostile work environment claim to exhaust it.").

9

that there was discriminatory harassment based on her sex, race, and color. (EEOC charge, Doc. No. 25-12). Accordingly, Ms. Kennedy's racially hostile work environment claim will not be dismissed for failure to exhaust administrative remedies.

## B. Employment Discrimination - Hostile Work Environment

"'Hostile work environment' is a term of art, which refers to an unlawful employment practice under Title VII that arises because of 'discriminatory intimidation, ridicule, and insult[s]' repeatedly directed at an employee on the basis of a protected characteristic." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 646 (6th Cir. 2015) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–16 (2002)). To prevail on a hostile work environment claim under Title VII, an employee must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on their membership in the protected group; (4) the harassment created a hostile work environment; and (5) the employer is liable. *See Doe v. City of Detroit, Michigan*, 3 F.4th 294, 300 (6th Cir. 2021).

As an initial matter, CEVA and WPS do not dispute that Ms. Kennedy is a member of two protected classes (sex, race) or that she was subjected to unwelcome harassment based on her membership in both of those protected groups. Nor is there any dispute that Ms. Kennedy was subjected to a sexually hostile work environment. Because "badgering, harassment, and humiliation alone can effectuate a constructive discharge" if it is "pervasive enough to significantly alter the plaintiff's working conditions," *Jemison v. AFIMAC Glob.*, 645 F. Supp. 3d 781, 800 (N.D. Ohio 2022) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 569 (6th Cir. 2001)), the parties' agreement that Ms. Kennedy was subjected to a sexually hostile work environment precludes summary judgment on the issue of constructive discharge.

10

Through their pending motions, CEVA and WPS claim Ms. Kennedy cannot establish the fifth essential element of her hostile work environment claims – employer liability. Specifically, CEVA and WPS argue Ms. Kennedy lacks evidence that either of them knew or should have known of the sexually or racially harassing conduct and failed to take prompt and appropriate corrective action. CEVA also challenges Ms. Kennedy's proof of severity for her racially hostile work environment claim. The Court will address Defendants' respective arguments in turn.

1. Proof of Severity – Element Three

CEVA attempts to show that Ms. Kennedy lacks evidence of a severely or pervasively racially hostile work environment by directing the Court to her deposition testimony that she complained to it and WPS that Mr. Reyes "sexually harassed her" and that he used "a racial epithet … in the course of his inappropriate behavior." (Doc. No. 23 at 1-2 (referencing Mr. Reyes' statement to Ms. Kennedy: "you go to Chicago to suck your [n-word]'s dick.")).

Whether harassing conduct is severe or pervasive is "quintessentially a question of fact." *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 687 (6th Cir. 2024). Courts "must consider the totality of the circumstances in determining whether the harassment was sufficiently severe and pervasive." *Strickland v. City of Detroit*, 995 F.3d 495, 506 (6th Cir. 2021) ("The harassing conduct cannot be viewed in isolation."). Factors relevant to this analysis include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Courts may also consider conduct and/or comments which disparage or single out members of a protected class of which the plaintiff is a member, even if the conduct and/or comments were directed at someone other than the plaintiff, because such evidence is relevant to whether a work environment was objectively

hostile. *See Strickland*, 995 F.3d at 506; *Jackson v. Quanex Corp.*, 191 F.3d 647, 660-61 (6th Cir. 1999). Facially neutral incidents may be considered in the hostile work environment analysis when there is some circumstantial or other basis for inferring that incidents neutral on their face were in fact discriminatory. *See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013).

According to CEVA, Ms. Kennedy's racially hostile work environment claim is premised entirely on evidence of a "single racial epithet," which "does not meet the standard for severe or pervasive harassment" as a matter of law. (*See* Doc. No. 23 at 12 (citing *Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 F. App'x 336, 338-39 (6th Cir. 2001) (one incident of racial harassment (not involving the n-word) over the course of almost *eight years* of employment was not severe or pervasive enough to support a racially hostile work environment claim). CEVA's argument fails as a matter of law and fact. First, CEVA ignores the undisputed evidence that Mr. Reyes *repeatedly* told Ms. Kennedy he would "buy" her daughter – as if she were a slave to be bought. (Pl. SOF ¶¶ 22, 116). Second, CEVA fails to acknowledge the evidence that it ignored Ms. Kennedy's report of racially harassing conduct and found Mr. Reyes sexually harassed white female employees but not Ms. Kennedy. (*See* Pl. SOF ¶¶ 73, 121-124). Third, case law does not support the proposition that a single use of the n-word is never sufficiently severe racially harassing conduct. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (an "extremely serious" isolated incident could be sufficiently severe for purposes of hostile work environment claim); *Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 977 F.3d 530, 543 n.7 (6th Cir. 2020) (the n-word "is perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry" and "the centuries of history that make the use of the term more than just a single word.") (cleaned up) (citations omitted).

2. <u>Adequacy of Employer Response – Element Five</u>

As noted above, CEVA and WPS both challenge Ms. Kennedy's ability to satisfy the fifth essential element of her hostile work environment claims. "The standard for employer liability differs depending on whether the harassment was carried out by a supervisor or coworker." *Doe v. City of Detroit, Michigan*, 3 F.4th 294, 301 (6th Cir. 2021). "In the case of a harassing supervisor, the employer is vicariously liable for the hostile work environment." *Id*. To show employer liability in the case of a harassing co-worker, an employee "must show that the employer knew or should have known of the conduct and failed to take prompt and appropriate corrective action." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016); *Schlosser*, 113 F.4th at 690–91 (same). "The appropriate corrective response will vary according to the severity and persistence of the alleged harassment." *Doe*, 3 F.4th at 301 (citation omitted).

CEVA attempts to show the absence of evidence that it failed to take prompt and appropriate corrective action by directing the Court to evidence that it: (1) launched an investigation in September 2022 and (2) issued Mr. Reyes a warning for violating its policy against sexual harassment later that month. (*See* Doc. No. 23 at 8-9). CEVA's foregoing argument fails to demonstrate that Ms. Kennedy lacks evidence on this point because it ignores the undisputed evidence that Mr. Brown personally observed Mr. Reyes' daily harassing conduct in July, August, September, and October 2022 without taking any corrective action. *See Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1079 (6th Cir. 1999) ("Although plaintiff did not directly complain to his supervisors about the problem until December 1994, McCauley, a supervisor, observed and in some instances contributed to the offensive conduct at KUKA, thereby putting defendants on notice of the conduct."). Additionally, CEVA fails to acknowledge the evidence that it ignored Ms. Kennedy's report of racially harassing conduct. (*See* Pl. SOF ¶¶ 73, 121-124).

13

Moreover, CEVA concedes that Mr. Reyes' sexually and racially harassing conduct continued after the warning was issued against him. (*See* Pl. SOF ¶ 92). Considering these facts in the light most favorable to Ms. Kennedy, a reasonable jury could conclude that CEVA's response was neither prompt nor appropriate.

WPS attempts to show the absence of evidence that it failed to take prompt and appropriate corrective action by directing the Court to evidence that it: (1) notified CEVA of Ms. Kennedy's report on September 1, 2022; (2) asked Ms. Kennedy on September 8, 2022, if she wished to be temporarily moved to a different work area during CEVA's investigation; and (3) followed up with Ms. Kennedy on September 30, 2022, to see how she was doing and offer to reassign her to a different client. (WPS SOF ¶¶ 9, 18, 23, 24).[12] However, WPS ignores the conflicting evidence as to whether it had notice of Mr. Reyes' racially and/or sexually harassing conduct long before September 1, 2022. (Pl. SOF ¶¶ 48, 49; WPS SOF ¶¶ 7, 8). Moreover, WPS fails to acknowledge that it only offered to reassign Ms. Kennedy to jobs with lower pay. (Pl. SOF ¶ 110). Viewing the facts in the light favorable to Ms. Kennedy and drawing reasonable inferences in her favor, the record contains evidence from which a reasonable jury could conclude that WPS' response was neither prompt nor appropriate.

---

[12] WPS cites to two out-of-circuit cases in support, but both are factually distinguishable from the present case where WPS had an onsite representative at CEVA. (Doc. No. 26 at 18 (citing *Riesgo v. Heidelberg Harris, Inc.*, 36 F. Supp. 2d 53 (D.N.H. 1997) (staffing agency's personnel not authorized to enter the client's premises without permission) and *Arredondo v. Elwood Staffing Servs., Inc.*, 81 F.4th 419 (5th Cir. 2023)). Further, the plaintiff in *Arredondo* did not report the harasser's conduct to the staffing agency until *after* the client had terminated the plaintiff's employment. 81 F.4th at 435 ("hostile work environment turns on whether [staffing agency] had actual or constructive knowledge of how [its client's] employees treated her.").

**C. Retaliation**

Ms. Kennedy claims that WPS retaliated against her for engaging in protected activity by garnishing her wages. Through its pending motion, WPS argues Ms. Kettles cannot show that it took an adverse employment action against her because of her report against Mr. Reyes.[13]

Title VII retaliation claims are decided under the familiar *McDonnell/Douglas* burden shifting framework whereby a plaintiff must first establish a prima facie case of retaliation by showing that (1) she engaged in protected activity; (2) the employer knew of the protected activity; and (3) the employer took an adverse employment action against her because of her protected activity. *Huang v. Ohio State Univ.*, 116 F.4th 541, 561 (6th Cir. 2024) (citing *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021)). An adverse employment action includes any conduct "that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Wyatt*, 999 F.3d at 419. When analyzing the prima facie case, a court "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action." *Taylor v. Geithner*, 703 F.3d 328, 339 (6th Cir. 2013) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003) (en banc)). The Plaintiff's burden at the prima facie stage is "minimal." *Wyatt*, 999 F.3d at 419. If Plaintiff establishes a prima facie case, the Defendant has a burden of production to articulate a non-retaliatory reason for the adverse employment action. (*Id*.). If the employer provides a non-retaliatory reason, the burden shifts to Plaintiff to prove that the proffered reason is pretext for retaliation. (*Id*. at 419-20).

As indicated above, WPS argues Ms. Kennedy cannot establish a prima facie case of retaliation. First, WPS asserts that garnishing wages "is not an adverse employment action as a matter of law." (*See* Doc. No. 26 at 21-22). However, WPS fails to direct the Court to any legal

---

[13] WPS does not claim to have a "legitimate, non-retaliatory reason" for garnishing her wages.

authority in support of its contention that wage garnishment would not have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Huang v. Ohio State Univ.*, 116 F.4th 541, 561 (6th Cir. 2024). In the absence of supporting legal authority, the Court is not persuaded that garnishing an employee's wages is not an adverse employment action as a matter of law.

Next, WPS argues Ms. Kennedy lacks evidence of causation if the Court disregards her testimony concerning causation. (*See* Doc. No. 26 at 22-23). Even without considering Ms. Kennedy's testimony, the close temporal proximity between Ms. Kennedy's report of Mr. Reyes' continued harassment and WPS's garnishment of her wages (1 week) easily satisfies the "not onerous" burden of showing causation for her prima facie case of retaliation. *See George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020). Accordingly, WPS has failed to demonstrate that Ms. Kennedy lacks evidence of her prima facie case of retaliation. And because WPS does not articulate a "legitimate, non-retaliatory reason" for garnishing Ms. Kennedy's wages, it has failed to meet its burden at step two of the *McDonnell Douglas* framework such that the Court does not reach pretext.

As WPS has failed to meet its initial burden, as the movant for summary judgment, the Court does not reach Ms. Kennedy's response regarding her retaliation claim. *See Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 726 (6th Cir. 2000) ("If a moving party fails to carry its initial burden of production, the non-moving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion.") (citation omitted).

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE